DET 0 88138                                                          43

# UNITED STATES DISTRICT COURT

## EASTERN MICHIGAN DISTRICT

| | |
|---|---|
| ALFONSO IGNACIO VIGGERS, | Case: 2:16-cv-10263 |
| Plaintiff, | Judge: Cohn, Avern |
| | MJ: Whalen, R. Steven |
| vs. | Filed: 01-26-2016 At 02:07 PM |
| | CMP VIGGERS v. BOARD OF REGENTS OF |
| BOARD OF REGENTS OF THE | THE U OF M (SO) |
| UNIVERSITY OF MICHIGAN and DOE | |
| DEFENDANTS, | |
| Defendants. | |

ALFONSO IGNACIO VIGGERS
PLAINTIFF PRO SE
2912 Birch Hollow Dr., Apt. 2-B
Ann Arbor, MI 48108
Ph. (415) 407-3548

## COMPLAINT

Plaintiff, ALFONSO IGNACIO VIGGERS, brings a civil action against the

Board of Regents of University of Michigan and Doe Defendants for the causes of breach

of contract, infringement of constitutionally protected rights, sabotage of immigration

procedures, conspiracy, obstruction of justice, violations to the Fair Credit Reporting Act,

and other acts contrary to public policy.

## INTRODUCTION

1.      Plaintiff is a database systems consultant. In 2007, he was hired by Alpac, Inc.

("the Intermediary", through its owner Al-Azhar Pacha) to perform database work for its

client, the University of Michigan ("the University" Defendant) at the latter's Plant

Operations IT Department ("the Department"). The University was quickly impressed by

Plaintiff's expertise and commitment. That was the beginning of a relation of mutual empathy and good faith between Plaintiff and the University that lasted for over seven years.

2.    The fact that Plaintiff and the University were in excellent terms is utmost clear. When Plaintiff resigned in 2012, he gave the University a 4-week notice. Plaintiff scheduled his resignation shielding the University from any contingencies during its sensitive Fiscal Year process. Five months later, the University asked the Intermediary to contact and rehire Plaintiff. While Plaintiff was out of the country and his work-visa was being processed, he agreed to perform some work --for free-- in consideration of the University's approaching deadlines.

3.    In 2014, the University opted to create a full-time, permanent position consisting of Plaintiff's functions. Plaintiff applied for the position and the University made the job offer to him. Plaintiff accepted the job offer notwithstanding a decrease in compensation and the ensuing dismissal of Plaintiff's ongoing Green Card process with the Intermediary. By sacrificing his immigration process, Plaintiff relied on the University.

4.    In January of 2015, Plaintiff started experiencing retaliatory, secretive, and arbitrary conduct on the part of University upper management. By contrast, Plaintiff's immediate supervisors frequently portrayed the imminence of Plaintiff's employment at the University. Employment was to start upon USCIS approval of the H-1B visa.

5.    In March of 2015, Plaintiff's stepmother began calumniating him by making false accusations at the University. Her purpose was to sabotage Plaintiff's employment.

6.    In the subsequent months, the Intermediary made unsuccessful attempts to lure Plaintiff into declining the University's job offer. Eventually, on July 21 of 2015, the

Intermediary made false accusations against Plaintiff. The University neglected to clarify the issue with Plaintiff and instead coordinated his abrupt dismissal as contractor, which happened on July 30 of 2015. The next day, the University notified Plaintiff that the job offer was annulled due to "*additional information that no longer makes [Plaintiff] a viable candidate for employment*".

7.    Plaintiff commenced civil actions against his stepmother. During the discovery, the University has been incurring obstruction of justice: faulty compliance with subpoenas, abuse of the attorney-client privilege, concealment of the Intermediary's unlawful acts, wrongful denial of the effects of stepmother's acts against Plaintiff, *inter alia*.


## THE PARTIES

8.    Plaintiff is a database systems consultant with notorious quantitative, abstract, and problem-solving skills. His commitment to self-improvement is also attested by his undergraduate degree in applied mathematics, his actuarial exams, and his graduate degree in mechanical engineering. He is a law-abiding individual with honorability and strong civic values.

9.    The (Board of Regents of the) University of Michigan is an institution dedicated to Education and Research. The University Defendant is regarded as an arm of the state. The University purports its compliance with the Fair Credit Reporting Act on matters of background checks. The University's Plant Operations Department is a subdivision of Facilities & Operations. In order of increasing authority, the managerial staff consists of Mr. Triska (Plaintiff's immediate supervisor), Mr. Loveless, Associate Director Gentles ("Assoc. Dir. Gentles"), Executive Director Robben ("Exec. Dir. Robben"), and

Associate Vice President of F&O Baier ("AVP Baier"). Ms. Amy Ranno ("Ms. Ranno") is the Human Resources Generalist Senior, and Mr. Jon Lund holds the title of Senior HR Representative to the Department.

10.     Doe Defendants. The University's secrecy impedes identifying with certainty the extent to what other parties colluded with the University's inequitable acts or abused their official capacity. Plausible parties are the Intermediary, Plaintiff's stepmother, Assoc. Dir. Gentles, and any individuals whose acts or negligence escape the Qualified Immunity doctrine or the Intra-corporate Conspiracy doctrine.

## JURISDICTION AND VENUE

11.     This District Court has jurisdiction over the Complaint on grounds of 42 U.S.C. § 1983: The University infringed rights that are granted by the Petition clause and the Speech clause of the First Amendment of the U.S. Constitution; the Due Process clause of Fourteenth Amendment; conspiracy to hinder due course of justice, 42 U.S.C. § 1985(2); conspiracy to deprive Plaintiff of his property and/or liberty rights, 42 U.S.C. § 1985(3); infringement of Plaintiff's rights under the Fair Credit Reporting Act, 15 U.S.C. § 1861p. This Court has supplemental jurisdiction on all other counts, as they relate in substance to the claims that qualify for Federal Jurisdiction.

12.     The instant civil action meets the standing requirement of the Article III Section 2 of the U.S. Constitution, for Federal Court: The University's acts violated Plaintiff's constitutional rights, and injured his protected property interests. Plaintiff pursues remedies to the unwarranted injuries and losses that to this date he endures.

13.     Venue is appropriate because all or most of the actions occurred in Washtenaw County, hence within the Michigan Eastern District.


## PLEADING OF FACTS

*The University becomes prospective employer*

14.     Upon being rehired to work for the University in January of 2013, Plaintiff was proposed a reduction in his hourly wage on grounds of the University's temporary *financial strain*. Plaintiff agreed upon the reduction, which became effective July 2013.

15.     Shortly after the agreement, the University was quick to offer significantly higher rates to potential, untested recruiters. Likewise, the University staff got promotions and salary raises while Plaintiff's hourly rate stayed at its reduced level. This inconsistency was disappointing to Plaintiff.

16.     July 31, 2014: Plaintiff asked the Intermediary for an overdue raise, the email being displayed in Exhibit A. In the absence a better idea for negotiating with the University, the Intermediary forwarded a portion of that email to the University. Assoc. Dir. **Gentles was allegedly angry for Plaintiff's remark** in that email. The rate increase was agreed upon, although this prompted the University to advertise the position consisting of Plaintiff's functions.

17.     The University persuaded the Intermediary to allow Plaintiff apply for the position. In December of 2014, the University made the job offer to Plaintiff. Exhibit B reflects that i) Plaintiff accepted the offer, and ii) the offer was contingent on a successful background check. Exhibit C illustrates the University's claim that it performs

background checks in compliance with the Fair Credit Reporting Act. Employment would begin upon USCIS approval of the work-visa.

18.      From Plaintiff's perspective, the University was too ambiguous about his requests for Green Card sponsorship. Then in January of 2015 Plaintiff learned that the papers to start his H-1B process were pending approval by AVP Baier's office. Plaintiff realized that the University was discarding Green Card sponsorship.

*Request to AVP Baier and the ensued scolding*

19.      Exhibit D displays a website of the University with AVP Baier's email address. The website has no disclaimer or warning against contacting him. On or around January 25 of 2015, Plaintiff emailed AVP Baier to advocate for sponsorship of his Green Card in lieu of a temporary H-1B visa. Plaintiff's professional skills, years of proven reliability, and good reputation clearly merit an opportunity for him to settle in the United States.

20.      In the morning of January 27, 2015, Assoc. Dir. Gentles called Plaintiff to a room and conducted a **managerial *beat-up***, scolding the Plaintiff for contacting AVP Baier. Plaintiff's email was not derogatory as to any personnel of the University whatsoever. Plaintiff's message touched a matter of public concern: the vulnerability and opprobrium surrounding the H-1B visas.

21.      Assoc. Dir. Gentles, himself an immigrant, disregarded Plaintiff's concern. What he reproached to Plaintiff was that his initiative to contact AVP Baier made him [Assoc. Dir. Gentles], Exec. Dir. Robben, and others *look bad*.

22.     For the first time, the University was clear: Assoc. Dir. Gentles sternly told Plaintiff that there would be no sponsorship for Green Card, *"not this year, maybe not the next year"*.

23.     The University requested premium processing to expedite Plaintiff's visa approval and Plaintiff submitted all his documents.

*First lure into declining the prospective employment*

24.     March 20 of 2015: Plaintiff learned that the Department Of Labor approved the Labor Certification that the Intermediary filed on behalf of Plaintiff. Plaintiff emailed Mr. Triska and Mr. Loveless aiming to materialize the benefit of that milestone. Plaintiff asked to extend the contract with the Intermediary at least until completion of the Green Card process (Exhibit E).

25.     After they inquired with upper management (or presumably Assoc. Dir. Gentles), they informed Plaintiff of the reluctance to postpone the employment for the reason that *"it would make [the Department] look bad"*.

26.     Instead, the University made the suggestion that i) Plaintiff could decline the position, then ii) the University would restart the hiring process, and iii) Plaintiff would be *welcome to apply*, although the University would not sponsor for H-1B again.

27.     Plaintiff decided to retain the job offered and let the H-1B process continue its course.

*Defamation against Plaintiff and interruption of his H-1B process*

28.     At the end of March, Ms. Ranno informed Plaintiff that his stepmother left voicemails with alarming accusations against him. Ms. Ranno inquired with Plaintiff on

whether he did anything that might preclude him from employment at the University. Plaintiff responded that the stepmother's accusations are false; that he has not interacted with the stepmother in thirty (30) years. Plaintiff gave some details of the stepmother's unlawful acts he learned through court documents. Plaintiff offered to present those court documents as proof of his testimony, but Ms. Ranno declined the offer and asked Plaintiff not to talk about the issue with the staff.

29.     April 29 of 2015: Plaintiff learned that the defamation against him was rampant. The stepmother made false reports to University and to the FBI. Once committed (by force of the police) to the Psychiatric Unit of the University Hospital, she contacted Exec. Dir. Robben as well as other personnel of the University to proffer outrageous, false accusations against Plaintiff. Ms. Ranno also informed Plaintiff that Exec. Dir. Robben ordered to suspend Plaintiff's work-visa process as a result of the accusations, and that the stepmother's actions were reflecting poorly on Plaintiff.

30.     By suspending the hiring procedures, Exec. Dir. Robben proceeded unfairly against Plaintiff. On May 1 of 2015, a court in Ann Arbor, MI, granted to Plaintiff a Personal Protection Order against the stepmother.

31.     May 5 of 2015: Plaintiff emailed the Personal Protection Order to Exec. Dir. Robben and the three layers of management in between (Exhibit F). To avoid a repeat of the scolding by Assoc. Dir. Gentles on January 27, Plaintiff refrained from cc-ing AVP Baier in that email.

32.     Plaintiff also requested that the University notified him and/or Law Enforcement if the stepmother approached the University again. Plaintiff never received any updates in that regard.

*Subsequent attempts to lure Plaintiff into declining the University's job offer*

33.      Plaintiff approached the Intermediary, aiming to resume the Green Card process before his Labor Certification expired. The Intermediary demanded that Plaintiff first declined the position at the University, giving July 1 as deadline. Plaintiff relied on the University's promissory acts and dismissed the Intermediary's demand.

34.      The Intermediary was aware that once the Plaintiff became employee of the University, the Intermediary would no longer profit from Plaintiff's work.

35.      July 21 of 2015: The Intermediary requested to meet urgently with Mr. Triska, Mr. Loveless, and Ms. Ranno. The Intermediary made the false statement that Plaintiff sent *direct threats* to him. The meeting was held on July 22, and there the Intermediary falsely attributed to Plaintiff words of threatening the Intermediary's business once the Plaintiff became employee of the University. After the meeting, the University employees recommended Plaintiff's termination and annulment of his prospective employment. Exhibit G shows Intermediary's letter and the University's reaction. Plaintiff was unaware of the Intermediary's acts.

36.      Coincidentally, also on July 21 Law Enforcement finally located the stepmother and served the Personal Protection Order upon her.

37.      In spite of being distressed by the stepmother's actions, her influence on University's executives, the unease of seeing his immigration prospects fade away, and a heightened workload, Plaintiff maintained his outstanding performance, good conduct, and excellent relation with his peers and customers. Accordingly, Plaintiff received verbal assurances of his employment up until late July.

*Plaintiff is unexpectedly terminated*

38.      July 30 of 2015: The Intermediary showed up at Plaintiff's workplace in the

afternoon, accompanied by a purported *marketing associate*. The Intermediary asked to

speak with the unsuspecting Plaintiff, and took him to a coffee shop. There the

Intermediary announced Plaintiff of his decision to terminate him, effective immediately.

39.      Back at the University's premises, Mr. Triska, Mr. Loveless, and Assoc. Dir.

Gentles were situated around a sealed box with Plaintiff's belongings. Plaintiff was not

even allowed to ensure that his emails accounts were signed out.

40.      July 31 of 2015: The University emailed Plaintiff a notification that the

University was annulling the job offer made to Plaintiff.


*Post-termination events*

41.      Plaintiff filed a defamation lawsuit against his stepmother. A subpoena was

served upon the University on August 12 requesting

> *"1) Recordings, writings, publications by Maria Viggers, all other complainants, and*
> *all other alleged witnesses bringing accusatory testimony against [Plaintiff] ... 3)*
> *Briefings and re[c]ords of managerial deliberations ... stemming from said*
> *testimonies."*

42.      The University only produced records that Plaintiff already knew about. Thus,

the production was inconclusive about what *additional information* led to the adverse

employment actions against him. The University impeded Plaintiff's subsequent attempts

to find out the contents or source of that information. Ms Ranno ignored Plaintiff's email inquiry, whereas Mr. Lund replied to Plaintiff that

> "*Information, and the source of that information, gathered between the time the contingent offer was made and subsequently rescinded is confidential, and will not be released to you*", and that

> "*The contingent offer of employment was properly rescinded*".

43.     During Plaintiff's civil action against his stepmother, the University has obstructed discovery to the extent possible. Plaintiff found out through subpoenas to nonparties that the University concealed other records implicating the stepmother.

44.     November 16 of 2015: Counsel for stepmother arranged with the University the deposition of Assoc. Dir. Gentles.

45.     November 17 of 2015: For the first time in three months, the University disclosed records of the Intermediary's defamation against Plaintiff. The University presumably had to sacrifice some of its secrecy in anticipation of the deposition of Assoc. Dir. Gentles.

46.     December 7 of 2015: Deponent Gentles seemed completely unaware of all matters related to the stepmother and her adverse effects on Plaintiff's hiring process. Excerpts of the deposition attest that Plaintiff was deprived of his rights. Thus, deponent Gentles answered why he met with Plaintiff on January 27 (Exhibit I):

> [deprivation of Speech and Petition clauses of the First Amendment]

> "*To instruct you that you're not an employee with the University of Michigan so as such you shouldn't be sending e-mails to our AVP. [...] so I said you shouldn't be sending our AVP an e-mail*", and

[deprivation of Due Process protections on property/liberty interests]

*"You're not an employee at the University of Michigan so we're under no obligation to talk to you regarding our decision".*

47.     December 17 of 2015: The deposition of Ms. Ranno was a competition of how much evidence the Plaintiff could pour out to get the deponent to talk. Too many of her responses were "*I don't know*" and "*I don't recall*", despite the fact that she was at the center of all deliberations, emails, and meetings regarding the stepmother's acts.

48.     December 18 of 2015: Pursuant to Plaintiff's subpoena, the University produced a supplemental response notorious for its entirely redacted pages. Exhibit J shows an excerpt of documents talking about Plaintiff three days prior to his abrupt termination. At hearing and in production of records, the University claims its attorney-client privilege to justify its redacted pages.

49.     December 22 of 2015: To Plaintiff's request for "*records on the internal deliberations to terminate [Plaintiff]*", the University FOIA Office responded in part that

*"We believe that in this particular instance, public interest in encouraging frank communication between University employees outweighs the public interest in disclosure".*

50.     Faulty testimonies and the University's reluctance to disclose records are likely to prevent the trial court to make an informed, fair ruling on Plaintiff's civil actions.

51.     Through its acts, the University has grossly dishonored the *1966 Statement on Government of Colleges and Universities* of the American Association of University Professors in that

*"The board ... should pay attention to personnel policy. [...] When ignorance or ill will threatens the institution or any part of it, the governing board must be available for support".* Accordingly,

*"[T]he board should make clear that the protection it offers to an individual or a group is, in fact, a fundamental defense of the vested interests of society in the educational institution".*

## COUNT I - 42 U.S.C. § 1983

### Retaliation for acts and rights that are protected by the First Amendment

52.      Plaintiff repeats and realleges all of the preceding paragraphs in this Complaint as if fully restated here.

53.      Plaintiff addressed AVP Baier aiming to redress the grievance of visa sponsorship (namely, toward pursuing Green Card instead of H-1B).

54.      Because the University is an arm of the State and the concern was expressed to AVP Baier in his official capacity, Plaintiff's initiative is protected by the Petition Clause of the First Amendment.

55.      Plaintiff expressed his concern that the temporary H-1B visas are the scapegoat in legislative processes. Foreign labor and employment-based immigration constitute/are matters of public concern that is frequently debated. Therefore, Plaintiff's case to AVP Baier is protected by the Speech Clause of the First Amendment.

56.      Plaintiff was severely reprimanded by Assoc. Dir. Gentles shortly after Plaintiff emailed AVP Baier.

57.     The *chilling effect* that the reprimand (a disciplinary action) from Assoc. Dir.
Gentles had on Plaintiff is attested in Plaintiff's letter on May 5 of 2015 (Exhibit F).
There, Plaintiff cc-ed the three managerial layers between him and Exec. Dir. Robben,
began with the disclaimer "*I'm not trying to blindside anybody*", and refrained to include
AVP Baier (despite the fact that AVP Baier was the decision-maker on the visa
sponsorship). Plaintiff limited himself to the wish that AVP Baier be updated.

58.     Thus, the University through Assoc. Dir. Gentles acted in a way that deterred
Plaintiff's free speech to redress his grievance.

59.     Plaintiff is a top-performing professional and he was not involved in any
incidents. Suspending Plaintiff's hiring process on grounds of the stepmother's false,
malicious accusations is indicative of retaliation for Plaintiff's grievance in January of
2015.

60.     Therefore the University is liable for retaliation against constitutionally protected
activities.


## COUNT II - 42 U.S.C. § 1983

### Procedural Due Process clause of the Fourteenth Amendment

61.     Plaintiff repeats and realleges all of the preceding paragraphs in this Complaint
as if fully restated here.

62.     Plaintiff was defamed by the stepmother. He offered proof of his claims but the
University declined to review them.

63.     A month later, the University suspended his hiring and work-visa processes
without giving Plaintiff an opportunity to submit the proofs he had offered.

64.     The Intermediary eventually took part in the defamation against Plaintiff. At that time, the University neither asked Plaintiff to clarify the matter nor informed him about the alarming statements that the Intermediary proffered against him.

65.     The University deprived Plaintiff of all protections, including but not limited to a pre-termination notice and a hearing, arising from his property/liberty interests. Instead, the University coordinated Plaintiff's abrupt termination and the annulment of his prospective employment.

66.     Therefore, the University is liable for gradual infringements of Plaintiff's right to a due process as granted by the Fourteenth Amendment.

## COUNT III - State Law

### Breach of Contract

67.     Plaintiff repeats and realleges all of the preceding paragraphs in this Complaint as if fully restated here.

68.     The University made to Plaintiff an offer of full-time, permanent employment. Plaintiff accepted the offer. These two elements constitute the formation of a contract between Plaintiff and the University.

69.     The terms of the contract were specified in writing: compensation, position title, supervisor, its contingency on a successful background check, and the stipulation of when the employment would begin.

70.     Even in the hypothetical absence of a contract in writing, the parties' acts are indicative of a contract implied-in-fact: The University initiated the hiring process, requested premium processing of the work-visa process, and repeatedly made verbal

assurances to Plaintiff as to his prospective employment. Likewise, Plaintiff willfully retained his prospective employment, despite the Intermediary's promises to resume the Green Card process on the condition that Plaintiff declined the University's offer.

71.     With no contingency other than a successful, FCRA-compliant background check, the implied or express contract between Plaintiff and the University constitutes a protected property interest under Michigan law.

72.     The University's responsibilities were i) to conduct a proper background check (determinant of whether to hire Plaintiff at all), and ii) to petition a work-visa (determinant of when would Plaintiff begin his employment with the University).

73.     In spite of that, the University defaulted on both of its responsibilities. The University suspended and never resumed its internal procedures for work-visa sponsorship, as a result of the stepmother's acts and her calumnies against Plaintiff. Then the University took adverse employment actions against Plaintiff, merely based on the Intermediary's false accusations of threats and in absolute disregard of the Fair Credit Reporting Act.

74.     The University's failure to properly rescind the contract further injured the Plaintiff. The University coordinated the termination of Plaintiff's job, and did so at a time in which Plaintiff's Labor Certification had expired. That timing nullified all the progress Plaintiff had accrued toward his immigration benefits. Consequently, the University's arbitrary decision did not restore Plaintiff to a position that he would occupy had no contract ever been made

75.     The University's conduct and unilateral acts constitute a complete repudiation of its contract with Plaintiff.

76.      Therefore, the University is liable for breach of contract.

## COUNT IV - 15 U.S. C. § 1681b

### Violations of the Fair Credit Reporting Act

77.      Plaintiff repeats and realleges all of the preceding paragraphs in this Complaint as if fully restated here.

78.      The University purports its compliance with the Fair Credit Reporting Act. The Act requires the University to send Plaintiff, prior to obtaining a consumer report, a clear and conspicuous notification that the consumer report on him might be obtained.

79.      The University never sent Plaintiff the aforementioned notification. In the alternative, Plaintiff holds the University to its proofs that it in fact complied with 15 U.S. C. § 1681b(b)(2)(i).

80.      Because the University did not approach Plaintiff on matters of the Fair Credit Reporting Act, the University deprived itself of Plaintiff's authorization in writing, 15 U.S. C. § 1681b(b)(2)(ii), to obtain a consumer report on him.

81.      When the University took adverse employment actions against Plaintiff, it failed to provide him with a copy of any adverse [consumer] report(s) and a description of Plaintiff's rights pursuant to 15 U.S. C. § 1681b(3)(A) *et seq.*

82.      The University justified its adverse employment actions against Plaintiff vaguely claiming *additional information*, which was not based on any consumer report. Assoc. Dir. Gentles and Ms. Ranno gave sworn testimonies that the *additional information* consisted of accusations made by the Intermediary. A background check of that quality is not compliant with the Fair Credit Reporting Act.

83.     Therefore, the University is liable for multiple violations of the Fair Credit Reporting Act.

## COUNT V - 18 U.S.C. § 241 and 42 U.S.C. § 1985(3)

### Conspiracy between the University and the Intermediary to injure Plaintiff's property/liberty interests

84.     Plaintiff repeats and realleges all of the preceding paragraphs in this Complaint as if fully restated here.

85.     An express or implied contract existed between Plaintiff and the University. The employment at the University was contingent on a successful/favorable background check. The University purportedly conducts its background checks in compliance with the Fair Credit Reporting Act.

86.     On July 21 and 22 of 2015, the Intermediary approached the University to make false accusations against Plaintiff. The Intermediary requested to *discuss [Plaintiff's] employment options* with the University. In fact, the Intermediary prompted the University to breach its contract with Plaintiff.

87.     On or around July 27 of 2015, the University arranged a meeting to coordinate the termination of Plaintiff, as shown in Exhibit J (several months later Plaintiff learned about that meeting).

88.     On July 30 of 2015, the Intermediary announced to Plaintiff that he was terminated, effective immediately. Then the Intermediary either called or pretended to call Mr. Triska to notify him that he, the Intermediary, decided to terminate Plaintiff.

89.     Because the Intermediary and the University are different *entities*, their coordination for the unlawful cessation of Plaintiff constitutes conspiracy.

90.     The conspiracy aimed to deprive Plaintiff of his livelihood and also of his prospective employment, contemplated under Michigan law as protected property interest(s).

91.     Therefore the University is liable for conspiracy to deprive Plaintiff of his protected rights.


## COUNT VI - 18 U.S.C. § 401 and § 1001

### Contempt of Court

92.     Plaintiff repeats and realleges all of the preceding paragraphs in this Complaint as if fully restated here.

93.     Plaintiff sued the stepmother in State court for defamation and damages.

94.     The court signed a subpoena, which was served upon the University on August 12 of 2015.

95.     The subpoena requested, *inter alia*, records of accusatory testimonies against Plaintiff and records of managerial deliberations stemming from those accusations.

96.     The University repeatedly attempts to mislead the Plaintiff through productions that are incomplete and/or inconclusive about the causes for his civil action.

97.     Plaintiff discovered through subpoena to a nonparty that the University omitted records it should have produced. The University was aware of those records beforehand. Plaintiff had to obtain a second subpoena specifically to obtain the calls that the stepmother made to the University's Police Department.

98.     For three months, the University concealed the accusatory testimonies that the Intermediary proffered against Plaintiff. Only in the anticipation of a deposition of a University employee, the University ~~sought~~ deemed convenient to uncover the Intermediary.

99.     The University chose Assoc. Dir. Gentles as deponent for Plaintiff's lawsuit against the stepmother. The deponent was unaware of all or most of the matters related to the stepmother. The choice of producing that witness tended to obfuscate the stepmother's acts for which Plaintiff is suing her.

100.    Later, Plaintiff took deposition of Ms. Ranno. He selected her because she is presumably the most knowledgeable employee of the University on matters of the stepmother. At deposition, Ms. Ranno resorted to answers that were evasive (*"I don't know"*, *"I don't recall"*), or different than what she informed Plaintiff in April of 2015, or tended to downplay the effect that stepmother's unlawful acts had Plaintiff's employment.

101.    The University also produced records excessively redacted, Exhibit J. Based on the date of these records, they in all likelihood relate to the civil actions he filed against the stepmother and the Intermediary. The University argues that the records are protected by the *narrow* attorney-client privilege, contrary to the principles of fairness that many courts apply when ruling on protection/disclosure of records.

102.    The attorney-client privilege is subject to the crime-fraud exception. Here, the University acted in furtherance of the malice directed at Plaintiff. Because all or most of the redacted records are traceable to the unlawful acts of the stepmother and the Intermediary (and presumably those of the University itself), the attorney-client privilege

does not protect the communications between the University and its counsel on Plaintiff's matters. The University ought to release the entirety of the records.

103.    Therefore, the University is liable for multiple instances of contempt of court.

## COUNT VII - State Law

### Promissory Estoppel

104.    Plaintiff repeats and realleges all of the preceding paragraphs in this Complaint as if fully restated here.

105.    The contract between Plaintiff and the University entails promissory character on the part of the University: contingency only on an FCRA-compliant background check, and sponsorship of a work-visa.

106.    The contract formed between the University and Plaintiff induced the latter to agree to less favorable conditions: i) a lower salary once Plaintiff is transferred to the University's payroll and, most important, ii) allow the factual dismissal of his immigration process with the Intermediary (acceptance of the job offer amounted to alienating the Intermediary as to Plaintiff's Green Card process).

107.    Plaintiff relied on the University's promise of permanent, full-time employment. He relied to the extent that he repeatedly dismissed the Intermediary's only condition that Plaintiff declined the University's offer (and the Intermediary would allegedly resume his immigration process).

108.    To avoid injustice, the University should have enforced the promise of permanent, full-time employment. Instead, it unfairly ordered the cessation of Plaintiff's assignment as consultant and the annulment of the Plaintiff's prospective position.

109.     Therefore, the University is liable for promissory estoppel.


## COUNT VIII

### Toirtious Furtherance of Malicious Intent

110.     Plaintiff repeats and realleges all of the preceding paragraphs in this Complaint as if fully restated here.

111.     Plaintiff's stepmother has a history of harassing people over the years: Plaintiff's mother, neighbors, husband's coworkers, employees of husband's landlord, and presumably the police, among others. In March of 2015, she targeted Plaintiff by defaming him at his workplace and filing malicious, false reports to Law Enforcement and multiple peace officers.

112.     The University was aware of the stepmother's intentions to sabotage Plaintiff's employment and his status in the U.S.: the stepmother searched for names and contact information of Plaintiff's peers and supervisors.

113.     Notwithstanding Plaintiff's brilliant performance at the University since 2007, upper management decided that a few incoherent emails from an unknown outsider deserved more credibility than Plaintiff.

114.     By orders of upper management (allegedly Exec. Dir. Robben), the University suspended Plaintiff's work-visa process on or around April 29, acting upon the stepmother's malicious acts.

115.     Then the University acted upon the fraudulent representations that the Intermediary made of Plaintiff. The University ordered Plaintiff's cessation effective July

30 of 2015. A day later, the University annulled Plaintiff's prospective position at the University.

116.    Thus, the University, an institution committed to education and research, aligned with the malicious intent of the stepmother and the fraudulent acts of the Intermediary. The University acted in furtherance of them and in absolute detriment to Plaintiff.

117.    To this date, the University conceals records and evidently crafts the testimony of its employees when called to testify at deposition.

118.    Therefore, the University is liable for at least one count of tortious furtherance of [stepmother's] malicious intent.


## COUNT IX

### Sabotage of Plaintiff's immigration process

119.    Plaintiff repeats and realleges all of the preceding paragraphs in this Complaint as if fully restated here.

120.    Plaintiff envisioned to fully integrate and immigrate to the U.S. The University was at all times aware of Plaintiff's wish to attain a permanent lawful status (aka Green Card, Permanent Residence) in the U.S.

121.    The University knew about Plaintiff's hardship to make the Intermediary address the sponsorship of an employment-based Green Card.

122.    In or around September of 2014, he University refused to postpone the advertisement of the job position so as to allow the completion of Plaintiff's immigration process.

123.    In January of 2015, the University through Assoc. Dir. Gentles reprimanded Plaintiff for bringing to the attention of AVP Baier the Green Card concern.

124.    In March 2015, the University denied Plaintiff's request to extend his employment with the Intermediary so that Plaintiff's Green Card process could reach completion.

125.    On or around April 29, 2015, the University interrupted Plaintiff's hiring process for the reason that the stepmother's actions were escalated and were reflecting poorly on Plaintiff.

126.    Plaintiff's Labor Certification expired on or prior to July 8, wiping out the progress toward obtaining his Green Card.

127.    On July 30, Plaintiff was abruptly terminated by alleged orders from the University (Exhibit H). A day later, the University incurred breach of contract and infringement of Plaintiff's protected property interests. The breach of contract entailed the University's repudiation of its promise of work-visa sponsorship.

128.    Therefore, the University is liable of sabotaging Plaintiff's immigration process.


**WHEREFORE**, Plaintiff respectfully prays this Honorable Court for the following relief:

I.    GRANT Plaintiff any relief that conduces to a change of his immigration status to Permanent Resident.

II.    COMPEL the University to admit that its adverse employment actions against Plaintiff were unlawful and unwarranted.

III.     COMPEL the University to immediately severe all its business and employment

relations with the Intermediary Al-Azhar Pacha.

IV.     PROHIBIT the University to conduct employment or business, direct or indirect,

with Al-Azhar Pacha in the future.

V.     COMPEL the University to reinstate Plaintiff to a different Department, with a

salary no lower than the amount he was earning as contractor, and with a contractual

clause of *termination for cause* .

VI.     COMPEL the University to terminate immediately and without severance Assoc.

Dir. Gentles and any other employees substantially responsible for the violations of

Plaintiff's rights.

VII.     COMPEL the University to display on all University websites (with the contact

information of AVP Baier) the disclaimer that any non-employee contacting AVP Baier

may be subject to disciplinary actions.

VIII.     GRANT Plaintiff reasonable fees and court costs.

IX.     GRANT Plaintiff recovery for exemplary damages, punitive damages, and any

other relief that this Court deems just and proper.


Respectfully submitted,

1/26/2016          *Iñaki Viggers San Mamés*

                Alfonso Ignacio Viggers
            2912 Birch Hollow Dr., Apt. 2-B
             Ann Arbor, MI 48108
              (415) 407-3548
             iviggers@yahoo.com

Office: 734-647-0823 / Cell: 734-476-5092
(ronl@umich.edu)

*Exhibit A, page 1 of 1*

On Thu, Jul 31, 2014 at 11:12 PM, Al-Azhar F. Pacha <pacha@alpacinc.com> wrote:
Good morning Ron,

Thank-you for taking the time to meet with me earlier this afternoon.

I forwarded your email to Alfonso for his comments…and apparently he isn't too happy with $70/hour rate
(his response is below…I've cc'd him on this email), especially while some contractor was getting paid a
much higher rate of $80/hour, while he was working at a reduced rate for one year.

As you are aware, Alfonso has an impeccable work performance track record along with excellent work
ethics.

Given these facts, can you please request your supervisor to reconsider a rate of $75/hour? This will
help Alfonso to remain motivated.

Appreciate your help…

*Thanks, Al Pacha.*

**From:** Iñaki Viggers [mailto:iviggers@yahoo.com]
**Sent:** Thursday, July 31, 2014 4:13 PM
**To:** Al-Azhar F. Pacha
**Subject:** Re: Alfonso Rate.

Pacha,
Thank you for the update.

I expected a higher raise. $70/hour was before the rebate that we mistakenly agreed upon in spring 2013. That rebate
only made room for the client to offer a $80/hour to developer who was yet to be known. Despite that, even that
developer left them; so did the one prior to him.

Thanks again,

Alfonso

**From:** Al-Azhar F. Pacha <pacha@alpacinc.com>
**To:** Iñaki Viggers <iviggers@yahoo.com>
**Sent:** Thursday, July 31, 2014 3:53 PM
**Subject:** FW: Alfonso Rate.

Hello Alfonso,

Please let me know your comments…

*Thanks, Pacha.*

**From:** Ronald Loveless [mailto:ronl@umich.edu]
**Sent:** Thursday, July 31, 2014 3:30 PM

Exhibit B, page 1 of 1

UNIVERSITY OF
**MICHIGAN**

# Fwd: Offer Letter
1 message

--------- Forwarded message ---------
From: **Ed Triska** <etriska@umich.edu>
Date: Fri, Dec 5, 2014 at 1:20 PM
Subject: Offer Letter
To: Alfonso Viggers <aviggers@umich.edu>
Cc: Ron Loveless <ronl@umich.edu>, Amy Ranno <aranno@umich.edu>

Good afternoon Alfonso,

On behalf of the Office of the Plant Director, Plant Operations at the University of Michigan in Ann Arbor, I am delighted to offer you the position of Applications Programmer Senior. This position reports to Ed Triska with an annual salary of $85,000. Per our recent conversation, you have accepted this position.

Your official start date will be dependent on green card or visa sponsorship approval. As this is the case, it is not possible to confirm an official start date at this time.

You will be eligible for the University benefits package as an exempt employee, including retirement packages, as described by the Benefits Office at www.benefits.umich.edu.

This offer is contingent on a successful background check.

I greatly look forward to you joining the team.
--
Thanks,
Ed

Plant Information Technology
Management Information Systems (MIS)
MIS Manager
Campus Safety Services Building
1239 Kipke Dr. Rm: 2510
Ann Arbor, MI 48109
Hours: M - F 9:00am - 5:30pm
O: (734) 647-3073
C: (734) 320-2020

--

Ron
------------------------------------
**Ronald D. Loveless**
Plant Operations, IT Manager
University of Michigan
2510 Campus Safety Services Building
1239 Kipke Drive

Viggers Sub Resp 74

Exhibit C, page 1 of 1

Home

Job Search

Graduate Student
Appointments

Nursing Careers

Temporary Jobs
and Student
Employment

Using This Site

University Benefits

Why Michigan?

home > job detail > data science consultant/database engineer

# Data Science Consultant/Database Engineer

**Apply Now**
(link opens in new window)

## How to Apply

A cover letter and resume are required for consideration for this position; include the cover letter as the first page of your application. The letter should specifically address your interest in this position and outline relevant skills and experience.

## Responsibilities*

We seek a data science consultant with expertise in the use of modern database technologies to support collection and analysis of large, complex, and heterogeneous data for research purposes. This individual will primarily work as a consultant in direct contact with U-M researchers who are engaging in independent research activities undertaken as part of the recently announced Data Science Initiative at the University of Michigan. We seek an individual with advanced technical skills who is able to work as part of an interdisciplinary research team. The consultant will support the implementation of database solutions that are part of U-M infrastructure as well as those provided externally.

## Required Qualifications*

- Graduate level training in computer or information science, or outstanding graduate training in a relevant area coupled with significant experience as a data scientist.
- Excellent oral and written communication skills, an aptitude for domain science, and a high level of autonomy and initiative are critical.
- Desired skills include fluency in SQL, Java, C++, and one or more scripting languages; ability to connect databases to analysis software such as R, Python, Matlab, SAS, and locally-developed software; familiarity with technologies for building web interfaces to databases including provisions for data security; familiarity with emerging database technologies including cloud databases, key-value stores and NoSQL, and experience using tools such as Spark and Hadoop to perform analytics on large databases.

## Desired Qualifications*

A positive attitude toward continuously learning new skills.

## Background Screening

The University of Michigan conducts background checks on all job candidates upon acceptance of a contingent offer and may use a third party administrator to conduct background checks. Background checks will be performed in compliance with the Fair Credit Reporting Act.

**Job Opening ID**
118252

**Working Title**
Data Science Consultant/Database Engineer

**Job Title**
Research Area Specialist Sr

**Work Location**
Ann Arbor Campus
Ann Arbor, MI

**Full/Part Time**
Full-Time

**Regular/Temporary**
Regular

**FLSA Status**
Exempt

**Organizational Group**
Vice Pres Research

**Department**
Ctr Statistical Consul & Res

**Posting Begin/End Date**
1/07/2016 – 1/31/2016

**Salary**
$65,000.00 – $90,000.00

**Career Interest**
Research

Exhibit D, page 1 of 1

Home > About the Office of the EVPCFO

# About the Office of the EVPCFO

### Executive Vice President and Chief Financial Officer (EVPCFO)

**Kevin Hegarty**  Bio
Phone: 734-764-7272
Fax: 734-936-8730
Email: hegartyk@umich.edu



## EVPCFO SENIOR STAFF

**Henry (Hank) D. Baier**
Associate Vice President for Facilities and Operations (AVPFO)
Phone: 734-764-3402
Email: hbaier@umich.edu



**Pam Gabel**
Executive Director of the Shared Services Center
Phone: 734-763-4517
Email: pgabel@umich.edu



**Nancy Hobbs**
Interim Associate Vice President for Finance (AVPF)
Phone: 734-764-7270
Email: hobbsn@umich.edu



**Erik Lundberg**
Chief Investment Officer (CIO)
Phone: 734-615-4445
Email: lerikl@umich.edu



**Laura McCain Patterson**
Associate Vice President for Information and Technology
Services and Chief Information Officer (AVPITS-CIO)
Phone: 734-763-7109

Exhibit E, page 1 of 1

UNIVERSITY OF
**MICHIGAN**

# Fwd: Update on Green Card
1 message

---------- Forwarded message ----------
From: **Alfonso Viggers** <aviggers@umich.edu>
Date: Fri, Mar 20, 2015 at 10:44 AM
Subject: Update on Green Card
To: Ronald Loveless <ronl@umich.edu>, Ed Triska <etriska@umich.edu>

Hi Ed, Ron,

I spoke with Pacha last night. My Labor Certification got approved. This means that I'm roughly six months from getting my Green Card, based on the backlog stats from USCIS.

As you can tell, I'm unease about how PlantOps/Luke/whoever's timing can be so disastrous to my immigration prospects. I need to remain in the current contract, at least while my Green Card gets processed. Otherwise Pacha won't move forward with the filing, as we all know.

I need to run this by Rich Robben, although I'm open to your suggestions other than to wait for something that may never happen. I can Cc Luke so as to not hurt his ego, but after the humiliating reprimand I experienced last January, I can no longer trust that he'll ever be willing to help; maybe quite the contrary.

Hopefully this time the arrangement will be more sober and appropriate than:
"oh, he asked for a raise? I'm going to end his contract."
"oh, he sent a request to Hank? I'm just going to scold him."

I'll wait for your insight before approaching Rich.

Thanks,

Alfonso

--

Ron
----------------------------------
**Ronald D. Loveless**
Plant Operations, IT Manager
University of Michigan
2510 Campus Safety Services Building
1239 Kipke Drive
Ann Arbor, Mi. 48109-2036
Office: 734-647-0823 / Cell: 734-476-5092
(ronl@umich.edu)

Viggers Sub Resp  81

Exhibit F, page 1 of 1

UNIVERSITY OF
MICHIGAN

## Fwd: Update on accusatory caller
1 message

--------- Forwarded message ---------
From: **Alfonso Viggers** <aviggers@umich.edu>
Date: Tue, May 5, 2015 at 10:28 AM
Subject: Update on accusatory caller
To: Amy Ranno <aranno@umich.edu>, Richard Robben <rrobben@umich.edu>
Cc: Ed Triska <etriska@umich.edu>, Ronald Loveless <ronl@umich.edu>, Lukeland Gentles
<genks@umich.edu>

Good morning All:

I'm not trying to blindside anybody, but this is mostly intended for upper Management and ideally the AVP office
(which I'll let you update). Please find attached the PPO against the individual who has been falsely accusing me
of multiple felonies. If Respondent violates the order by contacting the University, kindly notify me or Law
Enforcement.

With the average duration of PPOs being one year, it is noteworthy that this one is granted two years. Court files
from last year documenting how Respondent is suspect of similar dealings must have contributed to the extended
duration of this order.

Why am I sending this? Because just like upper Management stopped the H-1B based on someone's calumnies, I
wish it reconvened to resume my immigration process (Form I-140) based on my proven qualifications.

Best regards,

Alfonso


--

Regards,


Lukeland Gentles  M.B.A, CEFP

Associate Director and Division Controller

Plant Administrative Services

University of Michigan

1239 Kipke Drive

Ann Arbor, MI 48109 - 2036

Phone: (734) 764-0522

Viggers Sub Resp  46

Exhibit 6, page 1 of 2

UNIVERSITY OF
MICHIGAN

## Fwd: Regarding Alfonso Viggers (confidential)

1 message

---------- Forwarded message ----------
From: **Al-Azhar F. Pacha** <pacha@alpacinc.com>
Date: Tue, Jul 21, 2015 at 3:17 PM
Subject: Regarding Alfonso Viggers (confidential)
To: "Ronald Loveless (ronl@umich.edu)" <ronl@umich.edu>, Edward Triska <etriska@umich.edu>,
"aranno@umich.edu" <aranno@umich.edu>

Good afternoon Ron, Ed and Ann:

In the past couple weeks or so, there has been lots of development regarding Alfonso Viggers.

On the advice of our immigration attorney, ALPAC had to terminate Alfonso's Greencard immigration process
because of the employment offer from the University. Not terminating his Greencard process would have put
ALPAC in willful violation of the existing immigration laws. Alfonso was willing to decline the University
employment offer, but only after his Greencard was filed – he refused to provide a signed affidavit [prior to the
filing] stating that he has declined the University employment offer – hence ALPAC was left with no other option
but to follow the law of the land.

Alfonso wasn't pleased with the attorney's decision and as a result of which we have received direct threats from
him. As of this time, our attorneys are investigating various available options to mitigate his threats.

I would like to request a meeting as soon as possible with you'll (Ron, Ed and Ann) to discuss Alfonso's
employment options.

Thanks,

Al-Azhar F. Pacha, President

Viggers Sub Resp  64

Exhibit 6, page 2 of 2

UNIVERSITY OF
MICHIGAN

# Fwd: IMPORTANT! Confidential Personnel Matter

1 message

On Thu, Jul 23, 2015 at 7:27 AM, Lukeland Gentles <genks@umich.edu> wrote:
> k

On Wed, Jul 22, 2015 at 11:56 AM, Ronald Loveless <ronl@umich.edu> wrote:
> Luke,
>
> I need to talk with you tomorrow morning about Alfonso Viggers.
>
> After some new information, Amy from HR, Ed, and I are recommending we terminate his job as a contractor, and move to a reposting of the position, and backfill with a substitute contractor until a permanent staff member is hired.
>
> I can fill you in with the details tomorrow.
>
> --
>
> Ron
> -----------------------------------
> **Ronald D. Loveless**
> Plant Operations, IT Manager
> University of Michigan
> 2510 Campus Safety Services Building
> 1239 Kipke Drive
> Ann Arbor, Mi. 48109-2036
> Office: 734-647-0823 / Cell: 734-476-5092
> (ronl@umich.edu)

--

Regards,

Lukeland Gentles  M.B.A, CEFP

Associate Director and Division Controller

Plant Administrative Services

University of Michigan

1239 Kipke Drive

Ann Arbor, MI 48109 - 2036

Viggers Sub Resp  44



Exhibit H, page 1 of 1



BUSINESS & FINANCE
# FACILITIES & OPERATIONS
UNIVERSITY OF MICHIGAN

July 30, 2015

To:  Alfonso Viggers

From:  Ed Triska

Mr. Viggers,

After receiving additional information that no longer makes you a viable candidate for employment at the University of Michigan, we have re-evaluated our contingent offer of employment, and decided not to pursue sponsorship of your H1B Visa, which renders you ineligible for employment.

Additionally, we are contacting your employer, ALPAC-INC, that your assignment in our department is ending effective today.

We wish you the best in all your career endeavors.


Sincerely,
Edward S. Triska

MIS Manager

Exhibit I, page 1 of 2

Viggers v. Viggers
Lukeland Gentles                                    12/7/2015

Page 32

1    BY MR. VIGGERS:

2        Q.   Were you aware of the e-mail I sent to Associate

3    Vice President Beyer?

4        A.   Yes.

5        Q.   Do you recall that prompting a conversation

6    between you and I?

7        A.   Yes.

8        Q.   What do you recall of that e-mail?

9        A.   I remember you sending an e-mail regarding

10   your -- requesting that the University of Michigan

11   pursue a green card as opposed to H1 visa, and you

12   making a case with the associate or with the associate

13   VP.

14       Q.   What was the reason for you meeting with me?

15       A.   To instruct you that you're not an employee with

16   the University of Michigan so as such you shouldn't be

17   sending e-mails to our AVP.  We had already told you

18   that we would be pursuing the H1 visa.  We're not

19   pursuing a green card.  That was made clear when we made

20   you the job offer, which you accepted so I said you

21   shouldn't be sending our AVP an e-mail.

22       Q.   Are you aware that AVP's e-mail address is

23   accessible to the public?

24       A.   All our e-mails are accessible.

25       Q.   Was there a disclaimer against approaching -- let

EXHIBIT I, page 2 of 2

Viggers v. Viggers
Lukeland Gentles                                    12/7/2015

Page 26

1    **other party to hear the other side of the story?**

2                    **MR. FINLEY:**  Objection as to foundation.

3                    **THE WITNESS:**  Other party?  What other

4    party?

5                    **MR. VIGGERS:**  The accused party.

6                    **THE WITNESS:**  You're not an employee at the

7    University of Michigan so we're under no obligation to

8    talk to you regarding our decision.

9    **BY MR. VIGGERS:**

10      **Q.   Does that apply even to prospective employees?**

11      A.   Yeah.

12      **Q.   Did you as financial, as division counselor, did**

13   **you ever suspect a possible conflict of interest in**

14   **ALPAC's statements?**

15                   **MR. FINLEY:**  Objection.  Relevance, calls

16   for speculation.

17                   **MR. VIGGERS:**  Give me a response.

18                   **THE WITNESS:**  No.  After we discussed it I

19   didn't -- we didn't...after we discussed it, we viewed

20   the information as credible.

21   **BY MR. VIGGERS:**

22      **Q.   And by reviewing the information you mean the**

23   **threat of impacting negatively ALPAC?**

24      A.   The information that we got; that was a part of

25   it, yeah.

Exhibit J, page 1 of 5

UNIVERSITY OF
MICHIGAN

## Fwd: Alfonso Viggers' contract employee

1 message

---------- Forwarded message ----------
From: **Leti Rastigue** <lrastigu@umich.edu>
Date: Mon, Jul 27, 2015 at 1:14 PM
Subject: Fwd: Alfonso Viggers' contract employee
To: Kimberly Kiernan <kstoll@umich.edu>

Kim,

Per our conversation. This will give you some of the details regarding Alfonso Viggers. I have also attached the initial "contingent offer" along with the "rescinding letter.

I am setting up a meeting tomorrow at 7:30 to coordinate the termination process of this contract employee.

Leti Rastigue
University of Michigan
Human Resources Officer
Facilities and Operations
lrastigu@umich.edu
734-936-7398

REDACTED

Exhibit J, page 2 of 3

REDACTED

Viggers Sub Resp  276

2/5

Exhibit J, page 3 of 5

REDACTED

Viggers Sub Resp  277

3/5

REDACTED

Viggers Sub Resp  278

Exhibit J page 5 of 5

**2 attachments**

Vigger contingent offer.pdf
519K

Rescinding offer letter.docx
42K

JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

Case 2:16-cv-10263
Judge: Cohn, Avern
MJ: Whalen, R. Steven
Filed: 01-26-2016 At 02:07 PM
CMP VIGGERS v BOARD OF REGENTS OF
THE U OF M (SO)

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

rose Washtenaw

## I. (a) PLAINTIFFS

Alfonso Ignacio Viggers

**(b)** County of Residence of First Listed Plaintiff
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Pro Se   2912 Birch Hollow Dr. Apt. 2-B
Ann Arbor, MI 48108. (415) 407-3548

## DEFENDANTS

Board of Regents of the University of Michigan

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*   5010 Fleming Administration Building,
503 Thompson Street, Ann Arbor, MI 48109
(734) 764-0304

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
      Plaintiff

☒ 3  Federal Question
      *(U.S. Government Not a Party)*

☐ 2  U.S. Government
      Defendant

☐ 4  Diversity
      *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                              *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 830 Patent | ☐ 470 Racketeer Influenced and |
| Student Loans | ☐ 340 Marine | Injury Product | | ☐ 840 Trademark | Corrupt Organizations |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 720 Labor/Management | ☐ 862 Black Lung (923) | Exchange |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 751 Family and Medical | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| | ☐ 362 Personal Injury - | Product Liability | Leave Act | | ☐ 895 Freedom of Information |
| | Medical Malpractice | | ☒ 790 Other Labor Litigation | | Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | Income Security Act | ☐ 870 Taxes (U.S. Plaintiff | ☐ 899 Administrative Procedure |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | or Defendant) | Act/Review or Appeal of |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | 26 USC 7609 | ☐ 950 Constitutionality of |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | | State Statutes |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| | Other | ☐ 550 Civil Rights | Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original
    Proceeding

☐ 2 Removed from
    State Court

☐ 3 Remanded from
    Appellate Court

☐ 4 Reinstated or
    Reopened

☐ 5 Transferred from
    Another District
    *(specify)*

☐ 6 Multidistrict
    Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:

Brief description of cause: Breach of contract, violations of the FCRA and of protected rights

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
  UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions)*   JUDGE Hon. Carol Kuhnke (State court)   DOCKET NUMBER 15-799-CZ
                                                                                     15-1193-CZ

DATE 1/26/2016

SIGNATURE OF ATTORNEY OF RECORD   Inaki Viggers San Mames

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

## PURSUANT TO LOCAL RULE 83.11

1.       Is this a case that has been previously dismissed?       ☐ Yes
                                                                      ☒ No

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____

2.       Other than stated above, are there any pending or previously discontinued or dismissed companion cases in this or any other court, including state court? (Companion cases are matters in which it appears substantially similar evidence will be offered or the same or related parties are present and the cases arise out of the same transaction or occurrence.)      ☒ Yes   ☐ No

If yes, give the following information:

Court: Washtenaw County Trial Court, 22nd Judicial Circuit

Case No.: 15-799-CZ and 15-1193-CZ

Judge: Hon. Carol Kuhnke

Notes :